UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

TIMOTHY VAN PORTFLIET,

        Plaintiff,

v.                        CASE No.  8:05-CV-1474-T-TGW

H&R BLOCK MORTGAGE
CORPORATION,

        Defendant.

_____

<u>O R D E R</u>

THIS CAUSE came on to be heard upon the Defendant's Renewed Motion for Judgment As A Matter of Law, or Alternatively, for A New Trial (Doc. 71), the plaintiff's opposition memorandum (Doc. 75), and the defendant's reply (Doc. 78).  The motion challenges a jury verdict finding that the plaintiff's employment was terminated in retaliation for reporting conduct he believed was sexual and racial harassment toward others.  The verdict cannot be upheld because the plaintiff's report of this conduct was not,

as a matter of law, statutorily protected activity in that the conduct reported

was not even close to being sexual or racial harassment.

I.

During the pertinent time, the plaintiff Timothy Van Portfliet was

a sales manager for defendant H&R Block Mortgage Corporation in its Tampa

office and Elizabeth Sylves was a loan officer he supervised.[1]  Sylves and the

plaintiff had a good working relationship (Doc. 82, pp. 6, 25).[2]

On or about April 25, 2005, during what Sylves characterized as

"water cooler talk," Sylves told the plaintiff about an incident that occurred

at a company-sponsored happy hour at the Green Iguana Bar and Grill (id. at

pp. 7-8, 22; Doc. 83, p. 63-64).[3]  It involved Sylves, a friend, and then district

---

[1]Sylves is presently a senior mortgage consultant for the defendant (Doc. 82, p. 3).

[2]The defendant provided at the hearing on this matter transcripts of the trial testimony of Elizabeth Sylves and the plaintiff, and those transcripts have been filed in the record (Docs. 82, 83, respectively).

[3]There is a dispute as to when this conversation occurred. The plaintiff testified that Sylves initially came to speak with him on Friday, the day after the happy hour, but that she was too upset to talk about it and, consequently, she waited until Monday to tell him what happened (Doc. 83, pp. 16, 63, 64). Sylves, on the other hand, disputed that she was too upset to talk, and testified that she told the plaintiff about the incident, at the latest, on that Friday (Doc. 82, p. 25). Construing the evidence in the light most favorable to the plaintiff, it is assumed that the conversation occurred on Monday.

manager Paul LaBarbera (who was the plaintiff's supervisor) (Doc. 82, p. 11).

In this regard, Sylves testified (id. at p. 9):

> I told [the plaintiff] ... that I was at the event and that I thought it was weird that Mr. LaBarbera, who was the District Manager, made some what I felt was inappropriate comments to me; and what I said was ... he [Mr. LaBarbera] put his [arm] around me in front of a friend of mine and pointed to my friend and said, ["]Why would you want to be with him when you can be with me?["] And what I said to [the plaintiff] was I felt offended because I'm a married woman, and I felt that he was insinuating something that – and it hurt my feelings because I'm a happily married woman, and that's why I was – felt offended.

Sylves also told the plaintiff that "there was a racial comment made that night" to Wendall Paris, a black loan officer, but she did not tell the plaintiff what was said (id. at pp. 11, 22; Doc. 83, pp. 17, 65).

Sylves stated that, by telling the plaintiff about this incident, she "absolutely [did] not" intend to assert a complaint of sexual harassment or ask the plaintiff to do anything about it (Doc. 82, pp. 22-23). In fact, Sylves testified that she did not feel sexually harassed, and that LaBarbera's conduct did not create a hostile or abusive work environment (id. at pp. 23, 24). However, she said that she was offended because she felt LaBarbera was

insinuating something and that it hurt her feelings because she was a happily married woman (id. at p. 9).  The plaintiff confirmed that Sylves did not ask him to report LaBarbera's conduct (Doc. 83, pp. 65-66).

Nevertheless, on April 27, 2005, the plaintiff reported the incident to Gary Hudson, then director of human resources (id. at pp. 18-19). The plaintiff stated that he reported the conduct in accordance with company policy and also because he was personally distraught and upset by LaBarbera's conduct, which he thought violated Sylves's employee rights (id. at pp. 17-19, 66).

On May 11, 2005, LaBarbera was terminated for violating company policy (see Def. Ex. 12).  The plaintiff testified that LaBarbera's discharge was announced at a sales meeting at which Mark Pavlock, a regional vice-president for the defendant, stated that "it's a shame that we can't all have fun and work together" (Doc. 83, p. 20).  Pavlock offered the job to Brent Duffield, a district manager in the defendant's Atlanta area office (id. at pp. 21-22).[4]

---

[4]Hudson testified that this job offer was made outside the regular custom of posting available jobs.

The following week, Duffield traveled to Tampa to meet with the sales managers and, in general, evaluate the Tampa district. Hudson testified that, when Duffield arrived, Duffield told him that he wanted to fire the plaintiff for poor performance, although Duffield had not yet reviewed any documentation regarding the plaintiff's performance. Hudson also testified that he told Duffield the plaintiff had reported LaBarbera's inappropriate conduct, to which Duffield responded that he already knew. Duffield, however, testified that he did not know prior to terminating the plaintiff's employment that the plaintiff had reported LaBarbera's inappropriate conduct, and that he did not care.

Duffield testified further that, before making his decision to terminate the plaintiff, he spoke with the plaintiff and reviewed, among other things, production summaries and a notice of counseling placed in the plaintiff's file by LaBarbera in February 2005 (see Pl. Exs. 13, 15). The notice of counseling required the plaintiff's "immediate sustained improvement as a Sales Manager," and warned that failure to do so would "result in further disciplinary action, up to and including termination of your employment" (id.; Doc. 83, pp. 54-55).

The plaintiff's performance subsequently improved.  Thus, an e-mail dated April 4, 2005, congratulated the plaintiff on doing a "Nice job" (Pl. Ex. 12) and an e-mail dated May 5, 2005, noted that the plaintiff's team was first in submissions and units funded per loan officer (Pl. Ex. 10).

Nonetheless, Duffield testified that, on May 20, 2005, he spoke with Pavlock and stated that, as a condition of accepting the Tampa district manger position, he wanted to terminate the plaintiff's employment.[5]  On June 1, 2005, production numbers for May were released, and the plaintiff's numbers were the worst of the year.  Consequently, the next day Duffield had a meeting with Hudson and Pavlock regarding the termination of the plaintiff's employment.  Hudson  prepared the plaintiff's termination letter. On June 3, Duffield met with the plaintiff and terminated his employment, purportedly due to poor performance (Doc. 83, pp. 26-27; Pl. Ex. 8).

The plaintiff subsequently filed a timely charge of discrimination with the Florida Commission on Human Relations and the Equal Employment Opportunity Commission ("EEOC"), alleging that his employment was terminated in retaliation for reporting sexual harassment and race

---

[5]It appears that Duffield accepted the job on May 20, 2005 (see Pl. Ex. 9).

discrimination (Doc. 11, Ex. A).  After receiving a right to sue letter from the EEOC, the plaintiff filed this lawsuit, alleging retaliation for reporting sexual and racial harassment, in violation of Title VII of the Civil Rights Act, as amended, 42 U.S.C. 2000e *et seq.*; the Florida Civil Rights Act of 1992, Fla.Stat. 760.10 *et seq.*; and the Florida Whistleblower Act, Fla.Stat. 448.101 *et seq*. (Docs. 1, 11).  Prior to trial, the plaintiff withdrew his whistleblower claim (see Doc. 52).

The parties consented to the exercise of jurisdiction by a United States Magistrate Judge (Docs. 25, 26).  The plaintiff's claims of retaliation were tried by a jury (Docs. 57, 60, 62, 63).  The jury found that the plaintiff had "a good faith and objectively reasonable belief that the matters he reported constituted unlawful harassment" and that "the plaintiff's employment [was] terminated for reporting the harassment" (Doc. 64).  It awarded him $33,882 for past lost wages and benefits, but no damages for emotional pain and anguish (id.).[6]

---

[6]There was no award of punitive damages because the jury found that the defendant made a good faith attempt to comply with the law by adopting policies and procedures designed to prohibit discrimination and retaliation in the workplace (id.).

The defendant has moved for judgment as a matter of law or, alternatively, a new trial (Doc. 71).  The defendant argues that it is entitled to judgment as a matter of law because the plaintiff's report of LaBarbera's conduct was not statutorily protected activity.  Alternatively, the defendant seeks a new trial on the ground that the jury's verdict was against the great weight of the evidence.  The plaintiff filed a memorandum in opposition to the motion (Doc. 75).  The defendant was thereafter permitted to file a reply (Doc. 78).  Oral argument was subsequently conducted on the motion (see Doc. 81).

## II.

A.  Under Rule 50, F.R.Civ.P., if a party has been fully heard on an issue, and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue, the court may direct entry of judgment as a matter of law for the opposing party.  The well-established standards for resolving such a motion were summarized in Williams v. Motorola, Inc., 303 F.3d 1284, 1289-90 (11th Cir. 2002), as follows:

> We consider all the evidence, and the inferences drawn therefrom, in the light most favorable to the nonmoving party.  If the facts and inferences point overwhelmingly in favor of one party, such that reasonable people could not arrive at a contrary verdict, then the motion was properly granted.  Conversely, if there is substantial evidence opposed

to the motion such that reasonable people, in the exercise of impartial judgment, might reach differing conclusions, then such a motion [i]s due to be denied and the case was properly submitted to the jury.

It bears repeating that a mere scintilla of evidence does not create a jury question. Motions for judgment as a matter of law ... need not be reserved for situations where there is a complete absence of facts to support a jury verdict. Rather, there must be a substantial conflict in evidence to support a jury question.

The Supreme Court in Reeves v. Sanderson Plumbing Prod., Inc., 530 U.S. 133, 151 (2000), explained further that, when considering all the evidence in the record, "the court should give credence to the evidence favoring the nonmovant as well as that 'evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses'" (quoting 9A C. Wright & A. Miller, Federal Practice and Procedure, §2529, p. 300 (2d ed. 1995)).

B.  A court may grant a motion for new trial if the verdict is contrary to the great (and not merely the greater) weight of the evidence. Williams v. City of Valdosta, 689 F.2d 964, 973 (11th Cir. 1982).  Unlike the situation with a motion for judgment as a matter of law, the court on a motion for new trial may weigh the evidence, and, in weighing the evidence, is to

consider not only the evidence favoring the jury verdict, but evidence in favor of the moving party as well.  Id.  However, the court should not substitute its own credibility choices and inferences for the reasonable credibility choices and inferences made by the jury.  Rosenfield v. Wellington Leisure Prod., Inc., 827 F.2d 1493, 1498 (11th Cir. 1987).

Moreover, a court should be careful in considering a motion for new trial not to deprive a party of its right to a jury trial.  Fondren v. Allstate Ins. Co., 790 F.2d 1533, 1534 (11th Cir. 1986).  With a view toward protecting this right, a court in certain situations should grant greater deference to a jury verdict.  Williams v. City of Valdosta, supra, 689 F.2d at 974.  "Thus, when the trial involves simple issues, highly disputed facts, and there is an absence of 'pernicious occurrences,' trial courts should be considerably less inclined to disturb a jury verdict."  Id.

### III.

The defendant contends that it is entitled to judgment as a matter of law because the plaintiff failed to prove that his report of LaBarbera's conduct was "a statutorily protected activity," which is an essential element of a Title VII retaliation claim (Doc. 71, pp. 4-11).  See 42 U.S.C. 2000e-

3(a).[7]   Specifically, the defendant argues that the plaintiff's report of LaBarbera's conduct was not protected because the report did not come close to opposing unlawful sexual or racial harassment.

As pertinent here, a plaintiff engages in statutorily protected activity when he opposes an employer's conduct which is actually lawful, as long as he demonstrates "a good faith, reasonable belief that the employer was engaged in unlawful employment practices."  Weeks v. Harden Mfg. Corp., 291 F.3d 1307, 1311 (11th Cir. 2002); Henderson v. Waffle House, Inc., 2007 WL 1841103 at *4 (11th Cir. 2007) (unpub. dec.).  In this regard, the Eleventh

---

[7]Where, as here, the case presents a motion for judgment as a matter of law following a jury verdict, the court does not revisit whether a prima facie case of retaliation has been established.  Gupta v. Florida Board of Regents, 212 F.3d 571, 587 (11th Cir. 2000), cert. denied, 531 U.S. 1076 (2001).  The issue, rather, is simply whether there is legally sufficient evidence to support the jury's verdict.  Id.  Nevertheless, in analyzing that issue, it is helpful to consider the elements of a prima facie case.  Id.

In order to establish a prima facie case of retaliation under Title VII, a plaintiff must prove the following elements: (1) he engaged in statutorily protected conduct; (2) he suffered an adverse employment action; and (3) there is a causal connection between the participation in the protected activity and the adverse employment decision.  Farley v. Nationwide Mut. Ins. Co., 197 F.3d 1322, 1336 (11th Cir. 1999).  The burden then shifts to the defendant to produce a legitimate, non-retaliatory reason for the adverse employment action.  Id.  At that point, the plaintiff may succeed by directly showing that retaliation more likely motivated the defendant or indirectly by showing that the employer's proffered explanation is unworthy of credence.  Id. at 1336-37.

The Florida Civil Rights claim is analyzed in the same manner.  Harper v. Blockbuster Entertainment Corp., 139 F.3d 1385, 1387 (11th Cir. 1998), cert. denied, 525 U.S. 1000 (1998).

Circuit explained (Little v. United Technologies Carrier Transicold Div., 103

F.3d 956, 960 (11th Cir. 1997)(emphasis in original)):

> It is critical to emphasize that a plaintiff's burden
> under this standard has both a subjective and an
> objective component.  A plaintiff must not only
> show that he *subjectively* (that is, in good faith)
> believed that his employer was engaged in unlawful
> employment practices, but also that his belief was
> *objectively* reasonable in light of the facts and
> record presented.  It thus is not enough for a
> plaintiff to allege that his belief in this regard was
> honest and bona fide; the allegations and record
> must also indicate the belief, though perhaps
> mistaken, was objectively reasonable.

The defendant does not challenge the proposition that the

plaintiff subjectively believed that LaBarbera's conduct was unlawful

harassment.  Rather, the defendant contends that the plaintiff did not have an

objectively reasonable belief that the allegations he reported constituted sexual

or racial harassment (Doc. 71, p. 6).

The objective reasonableness of an employee's belief must be

measured against existing substantive law.  Clover v. Total System Services,

Inc., 176 F.3d 1346, 1351 (11th Cir. 1999).  Thus, although the conduct

opposed need not be unlawful sexual or racial harassment, the conduct "must

be close enough" to actionable harassment "to support an objectively reasonable belief that it is." Id.

An actionable hostile work environment harassment claim requires proof that "the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." Harris v. Forklift Systems, Inc., 510 U.S. 17, 21 (1993)(internal quotations and citations omitted); see also Clark Co. School Dist. v. Breeden, 532 U.S. 268, 270 (2001).[8] This standard is designed to be "sufficiently demanding to ensure that Title VII does not become a 'general civility code.'" Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998), quoting Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 80 (1998). Thus, "simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." Id.; see also Clark Co. School Dist. v. Breeden, supra, 532 U.S. at 271.

---

[8] The conduct must also be based on the person's sex or race, as applicable.

Whether a workplace is sufficiently hostile or abusive to affect the conditions of employment requires an evaluation of the totality of the circumstances, including (1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance.  Clark Co. School Dist. v. Breeden, supra, 532 U.S. at 270-71; Harris v. Forklift Systems, Inc., supra, 510 U.S. at 23.

A. Hostile work environment sexual harassment

The plaintiff's claim concerning sexual harassment is based on his testimony that Sylves told him that at a company-sponsored happy hour LaBarbera did the following (Doc. 83, p. 16):

> [LaBarbera] had put his arm around her, pulled her in to him and said, ["]Why do you want to be with a loan officer like that [referring to her male friend she was standing beside] when you can be with me?"

The notion that this conduct comes close to constituting unlawful sexual harassment is patently unreasonable.  Further, the totality of the circumstances confirms that LaBarbera's conduct was not pervasive or severe.

The inappropriate conduct occurred on only one occasion.  Thus, Sylves testified that LaBarbera never made to her an inappropriate comment before, or after, that happy hour event (Doc. 82, pp. 25, 26).  Consequently, the conduct was certainly not pervasive.

Moreover, the conduct cannot reasonably be termed severe. Notably, the Supreme Court in Faragher v. City of Boca Raton, supra, 524 U.S. at 788, indicated that, when there is only an isolated incident of inappropriate behavior, the conduct must be "extremely serious" to constitute sexual harassment.  Here, the conduct does not come even slightly near that level of severity.  Thus, there was no sexual or vulgar language uttered.  Also, while there was touching, there was no groping, fondling or sexual gestures. Further, the incident occurred outside the workplace in the presence of colleagues and subordinates at a happy hour, which suggests that it was done in jest.  In fact, the comment would reasonably be viewed, at least in part, as a joke aimed at Sylves's male friend.[9]

---

[9]The plaintiff attempts to bolster his case by including statements in his opposition that have no evidentiary basis.  Thus, contrary to the plaintiff's opposition memorandum, there is no evidence that Sylves said LaBarbera had propositioned her or that Sylves told the plaintiff that LaBarbera said she was having an affair with a co-worker (Doc. 75, p. 4). Moreover, there is no evidentiary support for the plaintiff's allusion that Sylves was accused of "sleeping her way to the top" (id. at p. 7).  These factual inaccuracies underscore the weakness of the plaintiff's case.

Moreover, there was no evidence that LaBarbera's conduct was physically threatening or humiliating.  Rather, Sylves placed LaBarbera's comment in the category of an offensive utterance.  See Clark Co. School Dist. v. Breeden, supra, 532 U.S. at 270-71 (was the conduct physically threatening or humiliating or "a mere offensive utterance").   Importantly, there is no evidence that the incident interfered with Sylves's work performance.  Clover v. Total System Services, Inc., supra, 176 F.3d at 1351.  Therefore, not surprisingly, Sylves testified that LaBarbera's conduct did not create a hostile or abusive work atmosphere and she does not believe that it was sexual harassment (Doc. 82, pp. 23, 24, 26).

Considering these facts in light of the Eleventh Circuit's sexual harassment case law, LaBarbera's conduct does not come anywhere close to supporting an objectively reasonable belief that it was actionable sexual harassment.  As indicated, the conduct was certainly not pervasive, and it fell far short of being severe, much less "extremely serious."  See Gupta v. Florida Board of Regents, supra, 212 F.3d at 586 ("[a]ll of the sexual hostile environment cases decided by the Supreme Court have involved patterns or allegations of extensive, long lasting, unredressed and uninhibited sexual threats or conduct that permeated the plaintiffs' work environment."); see,

e.g., Clark Co. School Dist. v. Breeden, supra, 532 U.S. at 271 (rejection of a retaliation claim based on the comment, "I hear making love to you is like making love to the Grand Canyon," because "[n]o reasonable person could have believed that the single incident ... violated Title VII's standard.").

Apparently recognizing the weakness of his position, the plaintiff attempts to give LaBarbera's words a greater spin than his words will bear. Thus, the plaintiff argues that a reasonable person would interpret LaBarbera to accuse Sylves of having an extra-marital affair and to propose that she have an affair with him (Doc. 75, pp. 5, 7-8). That, however, is not what LaBarbera said. LaBarbera's comment should be evaluated on the basis of what he said and not on the basis of what the plaintiff speculates LaBarbera had in mind when he made his comment. As previously explained, what LaBarbera actually said does not come anywhere close to the extremely serious remark that is necessary to constitute sexual harassment based on one comment.

Although LaBarbera's comment did not contain any explicit sexual language, it has been assumed that the remark had sexual overtones. Indeed, without that assumption, the contention that the remark amounted to sexual harassment could be summarily rejected. But even with the assumption

that the comment had a sexual connotation, the single remark falls far short of sexual harassment.

The plaintiff couples his extravagant interpretation of LaBarbera's comment with reliance upon <u>Sullivan</u> v. <u>National R.R. Passenger Corp.</u>, 170 F.3d 1056 (11th Cir. 1999), <u>cert</u>. <u>denied</u>, 528 U.S. 966 (1999) (Doc. 75, pp. 7-8). However, the plaintiff's reliance on <u>Sullivan</u> is misplaced. In <u>Sullivan</u>, the plaintiff alleged that he was the victim of sexual harassment when his supervisor allegedly stated at a hotel parking garage that, if the plaintiff accompanied him to his "room for a short while ... [the plaintiff] would not regret it." 170 F.3d at 1057. He also argued that he was retaliated against for reporting the conduct. The jury found against the plaintiff on the sexual harassment claim and in his favor on the retaliation claim. In addressing the defendant's motion for judgment as a matter of law on the retaliation claim, the court stated (<u>id</u>. at 1059):

> There is no dispute [by the parties] that Sullivan's complaint to Amtrak's management that he had been sexually harassed constituted protected expression nor that Sullivan suffered adverse employment actions. The only issue to be addressed here is whether a causal link existed between the adverse employment actions and the protected expression.

Thus, Sullivan simply did not present the issue under consideration here concerning whether the plaintiff reasonably believed that he was the victim of sexual harassment.

The governing principles for this issue are set forth not in Sullivan, but in Clover v. Total System Services, Inc., supra. Significantly, the Eleventh Circuit has recently applied Clover in somewhat analogous circumstances to conclude that a plaintiff had not engaged in statutorily protected activity. See Henderson v. Waffle House, Inc., supra, 2007 WL 1841103; Tatt v. Atlanta Gas Light Co., 2005 WL 1114356 (11th Cir. 2005) (unpub. dec.).

In sum, LaBarbera's conduct was certainly not pervasive and it was nowhere close to being severe. Consequently, an individual could not reasonably believe that the reporting of such conduct constituted opposition to unlawful hostile work environment sexual harassment.

B. Racial Harassment

The plaintiff also alleged that he engaged in statutorily protected activity when he reported that LaBarbera made a racial comment to Wendall

Paris, a black employee.  As indicated, the plaintiff was not told the substance of that comment.[10]

The Supreme Court has long held that the "mere utterance of an epithet ... does not sufficiently affect the conditions of employment to implicate Title VII." Harris v. Forklift Systems, Inc., supra, 510 U.S. at 21. Consequently, there is no basis upon which the plaintiff could have reasonably believed that one unspecified racial comment at a happy hour constituted unlawful racial harassment.[11]  Therefore, the plaintiff's claim that he engaged in protected activity by reporting alleged racial harassment fails.

This conclusion, combined with the previous determination that the plaintiff could not reasonably believe that LaBarbera's conduct towards Sylves constituted sexual harassment, means that the plaintiff was not engaged in statutorily protected activity when reporting LaBarbera's conduct. Therefore, since statutorily protected activity is an essential element of the

_____

[10]In his opposition memorandum, the plaintiff recounts the racial comment allegedly made by LaBarbera.  However, since the plaintiff did not know what was said, that comment is irrelevant to this analysis.  Clover v. Total System Services, Inc., supra, 176 F.3d at 1352.

[11]Also, the plaintiff did not testify at trial that he believed Paris's rights were violated by LaBarbera's comment.

plaintiff's retaliation claims, the defendant is entitled to judgment as a matter of law on those claims.

        C. The defendant also argues that the plaintiff's report did not constitute statutorily protected activity because reporting LaBarbera's conduct was one of the plaintiff's job responsibilities (Doc. 71, pp. 9-11).  In this connection, the defendant cites authority from other courts of appeals holding that a managerial employee does not engage in statutorily protected activity when his job requires him to report alleged unlawful conduct because he is not "stepping outside" his normal employment role to take action against discriminatory conduct.  See McKenzie v. Renberg's, Inc., 94 F.3d 1478, 1486-87 (10th Cir. 1996), cert. denied, 520 U.S. 1186 (1997); E.E.O.C. v. HBE Corp., 135 F.3d 543, 554 (8th Cir. 1998); Claudio-Gotay v. Becton Dickinson Caribe, Ltd., 375 F.3d 99, 102-03 (1st Cir. 2004).

        The defendant argues that the plaintiff similarly did not step outside his normal employment role when he repeated to Hudson the information given to him by Sylves regarding LaBarbera's conduct because he did so in accordance with company policy (Doc. 71, p. 5).  However, the principle relied upon by the defendant has not been considered by the Eleventh Circuit.

Moreover, it is unclear that such a rule would be applicable in this case because, while the plaintiff testified that he was obligated by company policy to report misconduct, he also said that he reported LaBarbera's conduct because it personally upset him and he thought that Sylves's rights had been violated (Doc. 83, pp. 18-19). Therefore, construing the facts most favorably to the plaintiff, the plaintiff's report was in part motivated by his personal opposition to unlawful employment harassment.

Under the circumstances, it is appropriate to pretermit resolution of this issue. After all, it has already been determined that there is a clear basis for granting the defendant's motion. There is, therefore, no reason for wrestling with a problematic issue.

## IV.

Alternatively, the defendant has moved for a new trial pursuant to Rule 50, F.R.Civ.P., on the grounds that there is insufficient evidence to support the jury's verdict. Rule 50(c) directs that the motion for new trial be resolved even though judgment as a matter of law will be entered for the defendant.

The defendant contends that it is entitled to a new trial because the plaintiff did not establish a causal connection between his alleged

protected activity and the termination of his employment (Doc. 71, p. 11).   In

this regard, the defendant argues that the plaintiff failed to show that Duffield,

the decision maker, was aware of the protected conduct at the time he took the

adverse employment action.   Id. at p. 12; Brungart v. BellSouth

Telecommunications, Inc., 231 F.3d 791, 799 (11th Cir. 2000), cert. denied,

532 U.S. 1037 (2001) ("the plaintiff must generally show that the decision

maker was aware of the protected conduct at the time of the adverse

employment action").   The plaintiff responds that Gary Hudson gave direct

evidence that Duffield knew about the protected conduct when he decided to

terminate the plaintiff's employment, and it was up to the jury to determine

whether to accept or disregard that testimony (Doc. 75, p. 14).

The defendant contends that the court should disregard Hudson's

testimony because it is "certainly suspect" (Doc. 71, p. 12).   Thus, the

defendant argues that Hudson "is nothing more than a disgruntled former

H&R Block Mortgage employee who had been terminated ... and wanted to

file his own legal action against the company" and who had also prepared e-

mails contemporaneous with the termination which contradicted his trial

testimony that Duffield knew of the plaintiff's protected activity prior to the plaintiff's termination (id.).[12]

The defendant presented these facts at trial for the jury's consideration, and it is uniquely within the province of the jury to decide credibility.  See Hewitt v. B.F. Goodrich Co., 732 F.2d 1554, 1558 (11th Cir. 1984)("When a jury is assembled to decide issues of fact they also decide credibility questions.... When the resolution of the case boils down to credibility, the trial judge must allow the jury to function").  In fact, this is precisely the type of circumstance that the jury is entrusted to resolve.  Here, the jury's credibility determination related to a simple issue, and it cannot be said that Hudson's testimony was so inherently incredible that this factual dispute could be removed from the jury.

The defendant also argues that the plaintiff "did not present credible evidence that the reason stated by [the defendant] for plaintiff's termination was a pretext" (see Doc. 71, pp. 14-17).  The defendant argued that it terminated the plaintiff's employment for poor performance.  The burden then shifted to the plaintiff to establish such "weaknesses,

---

[12]Hudson said that he lied when he stated in an e-mail that Duffield did not know of the plaintiff's report because he was told to do so by in-house counsel, Dana Clark.

implausibilities, inconsistencies, incoherencies or contradictions in the employer's proffered legitimate reasons for its actions that a reasonable factfinder could find them unworthy of credence." <u>Vessels</u> v. <u>Atlanta Indep.</u> <u>Sch. Sys.</u>, 408 F.3d 763, 771 (11th Cir. 2005).

Viewing the evidence in the light most favorable to the plaintiff, he exposed sufficient weaknesses in the defendant's explanation so that the jury could find that the defendant's proffered reason for the plaintiff's discharge was pretextual. Thus, as the plaintiff points out, a dispute arose at trial regarding the plaintiff's performance inadequacies. For example, although the plaintiff was issued a notice of counseling in February, his performance did subsequently improve. In this regard, two e-mails reflected the plaintiff's improvement, one of which included accolades for the plaintiff's team's performance. Additionally, Hudson's testimony at trial raised a factual issue as to the performance information that Duffield reviewed prior to deciding to terminate the plaintiff's employment. Moreover, there was evidence that the decision maker knew of the protected conduct when the adverse employment decision was made, and there clearly was temporal proximity between the plaintiff's protected conduct and the termination of his

employment.  See Farley v.  Nationwide Mut. Ins. Co., supra, 197 F.3d at 1337.

None of this evidence was addressed by the defendant in this argument; rather, it merely states in a conclusory manner that the "[d]efendant submits that the weight of the evidence at trial showed that defendant had a legitimate, non-discriminatory reason for terminating [the] plaintiff, which [the] plaintiff failed to overcome" (Doc. 71, p. 17).  Therefore, although the jury's verdict on the retaliation claim may have been against the greater weight of the evidence, it cannot be said that its finding that retaliation was a motivating factor in the plaintiff's termination was against the great weight of the evidence.  See Redd v. City of Phenix City, Ala., 934 F.2d 1211, 1215 (11th Cir. 1991).

It is, therefore, upon consideration

ORDERED:

1.  That Defendant's Renewed Motion for Judgment As A Matter of Law, or Alternatively, for A New Trial (Doc. 71) is hereby **GRANTED,** and judgment shall be entered in favor of the defendant and against the plaintiff.  The alternative motion for a new trial is hereby **DENIED**.

2.  That the Plaintiff's Motion to Tax Attorneys' Fees and Costs (Doc. 70), and the Plaintiff's Motion for Pre-Judgment Interest (Doc. 72) are **DENIED** as **MOOT**.

DONE and ORDERED at Tampa, Florida, this 21st day of September, 2007.

THOMAS G. WILSON
UNITED STATES MAGISTRATE JUDGE